IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

ROBIN L. MELODICK,                    )
                                      )
        Plaintiff,                    )
                                      )
v.                                    )        Case No. CIV-24-00071-JD
                                      )
PAMELA JO BONDI,                      )
United States Attorney General,       )
in her official capacity,             )
                                      )
        Defendant.                    )

## ORDER

Plaintiff Robin L. Melodick, a Special Agent with the United States Drug Enforcement Administration ("DEA"), has sued Pamela Bondi in her official capacity as Attorney General of the United States and federal official in charge of the DEA.[1] Ms. Melodick asserts a Title VII claim against the DEA.

The Attorney General of the United States moves for summary judgment in favor of the DEA ("Motion") [Doc. No. 39]. Ms. Melodick filed a response in opposition [Doc. No. 47], and the Attorney General filed a reply [Doc. No. 48]. For the reasons stated below, the Court grants the Motion.

## I.    BACKGROUND

Ms. Melodick, a female who has been employed with the DEA since December 2004, alleges she was subject to a hostile work environment created by three DEA management officials between March 2019 and May 2020. The three officials include:

---

[1] Ms. Melodick's Complaint originally named Merrick Garland, but Attorney General Bondi has been substituted under Federal Rule of Civil Procedure 25(d).

(1) Supervisory Criminal Investigator/Special Agent William Melodick, who is Ms. Melodick's former husband; (2) Acting Special Agent-in-Charge ("ASAC") John Scott; and (3) Special Agent-in-Charge ("SAC") Eduardo Chavez. The incidents began after Ms. Melodick's marital separation from Mr. Melodick and before their divorce was finalized on June 4, 2020. The Attorney General maintains that Ms. Melodick cannot establish the elements for a prima facie case because she does not have evidence sufficient to show that any alleged harassment was based on her sex or was objectively pervasive or severe enough to create an abusive work environment. *See* Motion at 27–32.[2]

## II.    <u>LEGAL STANDARDS</u>

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is material if under the substantive law it is essential to the proper disposition of the claim." *Savant Homes, Inc. v. Collins*, 809 F.3d 1133, 1137 (10th Cir. 2016) (internal quotation marks and citation omitted). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Doe v. Univ. of Denver*, 952 F.3d 1182, 1189 (10th Cir. 2020) (explaining that a dispute over a material fact is genuine "if a rational jury could find in favor of the nonmoving party on the evidence presented" (citation omitted)). However,

---

[2] The Court uses CM/ECF page numbering from the top of district court docket filings in this Order.

disputes over facts "that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

In applying the summary judgment standard, the Court "'review[s] the facts and all reasonable inferences those facts support[] in the light most favorable to the nonmoving party.'" *Doe*, 952 F.3d at 1189 (second alteration in original) (quoting *Evans v. Sandy City*, 944 F.3d 847, 852 (10th Cir. 2019)). Nevertheless, a nonmovant cannot rely on unsupported conclusory allegations to overcome summary judgment. *See Salehpoor v. Shahinpoor*, 358 F.3d 782, 789 (10th Cir. 2004). "In reviewing the facts, at summary judgment, the party who bears a burden of proof on an issue bears the burden of production rather than the burden of persuasion." *Markley v. U.S. Bank Nat'l Ass'n*, 59 F.4th 1072, 1080 (10th Cir. 2023) (citing *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1115 (10th Cir. 2007)). Ultimately, review of a district court's ruling on summary judgment is "from the perspective of the district court at the time it made its ruling, ordinarily limiting . . . review to the materials adequately brought to the attention of the district court by the parties." *SEC v. GenAudio Inc.*, 32 F.4th 902, 920 (10th Cir. 2022) (citation omitted).

## III.    <u>UNDISPUTED MATERIAL FACTS</u>[3]

Ms. Melodick is a female DEA Special Agent and has been employed with the agency since December 2004. In June 2008, Ms. Melodick married William Melodick,

---

[3] This section includes material facts that are properly supported by the asserting party and not opposed in the manner required by Rule 56(c). Any fact not supported by citation to the record is disregarded. All facts are stated in the light most favorable to the nonmovant, Ms. Melodick.

who was also employed by the DEA. They have two children. In January 2016, Ms. Melodick and Mr. Melodick were both reassigned to the DEA's Oklahoma City District Office ("OKCDO"), which is a component of the DEA Dallas Domestic Field Division ("DFD"). At various times, Ms. Melodick has been the sole female Special Agent in the OKCDO.

In August 2018, Mr. and Ms. Melodick began a marital separation, which ended in divorce on June 4, 2020. They share custody of their two children, but Ms. Melodick rarely speaks to Mr. Melodick "unless it has to do with [their] children." [Doc. No. 39-2 at 6 at 23:4–5].

During the relevant time period,[4] Ms. Melodick was a GS-1811-13 Criminal Investigator/Special Agent with the DEA, and Mr. Melodick was a GS-1811-14 Supervisory Criminal Investigator/Special Agent with the DEA. Mr. Melodick also served as the ASAC of the OKCDO from March 2019 through June 2019, and as a Group Supervisor ("GS") from June 2019 through March 2020. For the three months Mr. Melodick was ASAC of the OKCDO, he was Ms. Melodick's second-line supervisor. Additionally, from April 18 through April 21, 2019, Ms. Melodick served as Acting GS,

---

[4] Ms. Melodick alleges in her Equal Employment Opportunity ("EEO") complaint and in the Complaint that she was subjected to a hostile work environment based on incidents occurring between March 2019 and May 2020. *See* [Doc. No. 1 ¶¶ 25–90; Doc. No. 39-4]. On October 23, 2020, the DEA accepted for investigation Ms. Melodick's claim she had "been subjected to a hostile work environment based on sex (Female) when, since March 2019, [she had] been subjected to demeaning and harassing treatment, irrational personal attacks, unevenly applied rules, changes in [her] duty schedule, threats, and pressure to interact with [her] former spouse." [Doc. No. 39-7 at 1]. In its October 23, 2020 letter, the DEA informed Ms. Melodick she had five calendar days to notify the DEA if she disagreed with the statement of issues to be investigated. Ms. Melodick did not object to the statement of issues set out in the October 23, 2020 letter.

and on those four days, Mr. Melodick was Ms. Melodick's direct supervisor. At all other times during the relevant period, Mr. Melodick was not within Ms. Melodick's chain of command.

On August 10, 2020, Ms. Melodick filed her EEO complaint against the DEA alleging she experienced a hostile work environment rooted in sex-based discrimination. She has identified three DEA management officials as the individuals who subjected her to the hostile work environment, including: (1) Mr. Melodick, (2) John Scott, who assumed the position of ASAC of the OKCDO on June 10, 2019, and became Ms. Melodick's second-line supervisor; and (3) Eduardo Chavez, who assumed the position of SAC of DFD in January 2020, and became Ms. Melodick's third-line supervisor.

## A.    Events Occurring in April and May 2019 while Mr. Melodick was ASAC

- On April 19, 2019, Mr. Melodick released employees from work due to inclement weather without informing Ms. Melodick, although she was the Acting GS on that day.

- On May 2, 2019, Mr. Melodick and Ms. Melodick attended a training event on liquid methamphetamine. During the event, Ms. Melodick recalls that Mr. Melodick "stood directly in [her] path of egress, scowling at [her], with his arms crossed on his chest," so that Ms. Melodick was forced to say "excuse me" to move past him to return to her seat. [Doc. No. 39-4 at 14]. Ms. Melodick contends that Mr. Melodick ignored her and refused to move, remaining in the same position; thus, she was forced to push past him to get to her seat.

- On May 17, 2019, Mr. Melodick drove his official government vehicle to the former marital residence to pick up some items, including personal belongings, in advance of the closing on the sale of the Melodicks' marital home. Ms. Melodick knew in advance that Mr. Melodick would be coming by the house, and she did not object.[5]

_____

[5] Three years later, the DEA's Board of Professional Conduct proposed to suspend Mr. Melodick for thirty days, without pay, on a charge of unauthorized use of an official government vehicle based on the Board's conclusion that Mr. Melodick violated DEA

- Ms. Melodick recalls that while Mr. Melodick was ASAC, he would walk behind her desk. She described the encounters as follows:

  "I was doing my work, so it didn't matter. . . . I don't care if he sees what reports I'm typing. It's just a fact that he was doing it. Anyway, it was an act of intimidation and just, you know, harassment." [Doc. No. 39-2 at 13 at 72:13–17].

## B.    Events Occurring in June 2019

- On June 21, 2019, Ms. Melodick forwarded a series of work emails to Mr. Melodick with the subject line: "FW: FY/19 3rd Qtr High Value Evidence & Safekeeping Rpt." Ms. Melodick did not include any text in the body of the email. The forwarded email chain included two emails:

  1) An email dated June 4, 2019, from DEA DFD Administrative Support Specialist Sandra Luckey, which was addressed to multiple email recipients, including Ms. Melodick and Mr. Melodick, and referenced an upcoming deadline to complete the 3rd Quarter High Value Evidence & Safekeeping Reports;[6]

  2) An email dated June 21, 2019, from Ms. Melodick to Ms. Luckey, in which Ms. Melodick advised: "We will complete the actual HVSRM audit on Monday but I am attaching our numbers for you. As of today, 6-21-2019, we have nothing on hand to account for (that hasn't already been accounted for)." [Doc. No. 39-9 at 1].

- On June 21, 2019, Mr. Melodick forwarded Ms. Melodick's email to ASAC Scott and stated in the email: "These are the types of things that I try and take the high road on. I am not sure why Robin forwarded this to me with no direction but I would assume it should go to you for signature." *Id.*

- That same day, Mr. Melodick forwarded Ms. Melodick's email to Ms. Melodick's then first-line supervisor GS Shan Spain and stated in the email: "I forwarded this to John and not sure why it is coming to me. There was also no direction from Robin on what to do with it." *Id.* at 3.

---

policy on May 17, 2019, when he used his official government vehicle for personal purposes.

[6] Completing this report was one of Ms. Melodick's collateral duties.

- On June 24, 2019, Ms. Melodick sent Mr. Melodick an email explaining she had forwarded the earlier email chain to "keep [him] apprised that [she] was taking care of one of [her] collateral duties." *Id.* at 5.

- Mr. Melodick thereafter forwarded Ms. Melodick's email to ASAC Scott, explaining that "[i]f the information provided below was explained in the original email, it would have been" clearer. *Id.*

- On June 24, 2019, GS Spain, Ms. Melodick's first-line supervisor at the time, spoke to Ms. Melodick about her email exchanges with Mr. Melodick. GS Spain conveyed instructions from ASAC Scott that, in the future, when Ms. Melodick needed to communicate with Mr. Melodick on a work-related matter she should do so through her supervisor instead of directly emailing, texting, or calling Mr. Melodick.

- Around that same time, Ms. Melodick spoke with ASAC Scott. She explained to ASAC Scott that she felt Mr. Melodick's forwarding of her incomplete report to him "was unprofessional and intentional." [Doc. No. 39-4 at 19]. In response, ASAC Scott said he was aware that Ms. Melodick and Mr. Melodick were going through a divorce, but he indicated that he expected "professional behavior," and he reiterated that Ms. Melodick was not to directly communicate with Mr. Melodick regarding work-related matters. *See id.*

- Ms. Melodick also expressed her frustrations with ASAC Scott about the time when Mr. Melodick served as ASAC, and ASAC Scott assured her he would not put her in a situation where she was reporting directly to Mr. Melodick.

- During this same conversation with ASAC Scott, Ms. Melodick mentioned she was thinking about moving desks to limit her visibility of Mr. Melodick.

- Ms. Melodick moved her desk sometime in June or July 2019, but she contends that even after she moved her desk, Mr. Melodick continued to walk by and stare her down, although Ms. Melodick did not report this to her supervisor.

- On June 26, 2019, Ms. Melodick saw a Dodge Ram truck near her new home in Edmond. She believed this vehicle was driven by Mr. Melodick, and that he was surveilling her. When she started to move her vehicle, the driver of the truck accelerated away. Ms. Melodick tried to follow the truck, but she was unable to observe the identity of the driver because the

windows were tinted. Ms. Melodick followed the vehicle, which had the same last two numbers of the car tag for Mr. Melodick's government truck. Mr. Melodick denied it was him on several occasions. Ms. Melodick reported the incident to her supervisor GS Spain as she was driving to work, and she also reported it to another DEA employee at the office. GS Spain reported Ms. Melodick's allegations to ASAC Scott. ASAC Scott asked Mr. Melodick about the incident, and Mr. Melodick denied it was him.

▪ Mr. Melodick has denied that he mistreats females. Deborah Johnson, a former DEA OKCDO employee, advised that Mr. Melodick treated her "differently being a female." [Doc. No. 47-6 at 7 at 32:16–23]. For instance, if Ms. Johnson went to Mr. Melodick with a question or a problem, she described their interaction as "short and sweet, get to the point" in that Mr. Melodick "didn't want to hear it if there was a complaint about anything." *Id.* Ms. Johnson further explained that "[i]f you were a guy and you walked in there with anything, [Mr. Melodick] would sit and chat with you and deal with anything that happened." *Id.*

## C.    Events Occurring in September and October 2019

▪ DEA special agents, including those at OKCDO, are required to take turns serving as the "duty agent," which involves carrying the duty phone and responding to inquiries during the duty shift that can occur outside normal working hours and on weekends and holidays. GSs, including Mr. Melodick, are not on the weekly duty schedule, but are on call for the entire month.

▪ Before October 2019, OKCDO's weekly duty schedule ran from Friday to Friday, meaning the duty agent picked up the duty phone on Friday and returned it the following Friday.

▪ In September 2019, Mr. Melodick approached ASAC Scott and asked if it would be possible to change the duty schedule from Friday to Friday to Monday to Monday to align with the Melodicks' child custody schedule.

▪ Prior to September 2019, the Melodicks exchanged custody of their children on Sundays. Mr. Melodick preferred a child custody schedule where he and Ms. Melodick would exchange the children on Monday. Ms. Melodick preferred Friday as the exchange day because that coincided with the duty phone schedule in place. Both agreed it would be beneficial to exchange the children on the same day the duty schedule started.

■ Thereafter, ASAC Scott spoke with Ms. Melodick about the proposed change to the duty schedule, and she expressed concern because the change would affect others in the office. Ms. Melodick recalls telling ASAC Scott that she and Mr. Melodick had been engaged in discussions through their attorneys about the child custody schedule for four to five months, and that Mr. Melodick had never provided a reason for why he wanted a Monday-to-Monday schedule. Mr. Melodick admitted in his deposition that he asked ASAC Scott to change the duty schedule from Friday to Friday to Monday to Monday because it would allow his children to play with friends in the neighborhood, one of whom was the son of the woman he was dating at the time.

■ On September 19, 2019, Ms. Melodick and Mr. Melodick signed an Agreed Temporary Order that established "a week on/week off schedule with the minor children exchanging on Monday mornings with return to school/daycare." [Doc. No. 39-10 at 2].

■ On October 1, 2019, at the direction of ASAC Scott, OKCDO's weekly duty schedule was changed to a Monday-to-Monday schedule.

■ ASAC Scott believed that "nobody really cared when they [got] the phone because it's for [the] same amount of time." [Doc. No. 39-5 at 10]. A week after the duty schedule was changed, GS Spain told ASAC Scott that Ms. Melodick was unhappy that other agents and task force officers had to have their schedule changed. *Id.* GS Spain testified that after he agreed to the schedule change without seeking input from the task force group, he learned that a couple of the people in the task force group were upset with the schedule change and would have rather kept it Friday to Friday. [Doc. No. 47-3 at 14–16 at 20:15–22:7].

■ Ms. Melodick continued to successfully complete her duty agent responsibilities after the schedule change.

### D.    Events Occurring in December 2019 through February 2020

■ In late December 2019, ASAC Scott approached Ms. Melodick and asked her if she would be interested in moving downstairs to the Tactical Diversion Squad ("TDS"). TDS is within OKCDO, but it sits on a different floor from the group that Mr. Melodick supervised. Ms. Melodick agreed to the move because ASAC Scott said he wanted an experienced special agent in the TDS group and because it would create some space between her and Mr. Melodick.

- Effective January 19, 2020, Ms. Melodick was detailed from her prior group (task force) to TDS. There was no change in pay or title associated with the move.

- Upon her move to TDS, Ms. Melodick's first-line supervisor was GS John Beasley.

- As a result of the Agreed Temporary Order, Mr. Melodick and Ms. Melodick, for the most part, no longer met in person to exchange custody of their children. Consequently, it became necessary to facilitate an exchange of some of the children's personal items that were too large to send to school, such as sports equipment. Mr. Melodick and Ms. Melodick disagreed on where to make the exchange. Ms. Melodick wanted to use the sally port at work, but Mr. Melodick did not want to exchange personal items at work. When they could not reach an agreement, Mr. Melodick asked ASAC Scott to get involved.

- ASAC Scott consulted SAC Chavez about the issue and his proposal that the two exchange the children's personal items in the parking lot, to which SAC Chavez told ASAC Scott to do what he thought was best for the office.

- Thereafter, ASAC Scott did not allow Mr. Melodick and Ms. Melodick to exchange their personal items inside the building. He did not mandate that the exchanges occur in the parking lot but only stated that the items could not be exchanged inside the building. Both ASAC Scott and SAC Chavez were aware that Ms. Melodick wanted no contact with Mr. Melodick.

## E.    Events Occurring in April and May 2020

- On or about April 26, 2020, Mr. Melodick asked Ms. Melodick to keep custody of their children for another week because of a potential COVID exposure in his group.

- Two days later, Ms. Melodick emailed ASAC Scott to ask why the potential COVID exposure she heard about from Mr. Melodick was not communicated to the office. In the email, Ms. Melodick stated, in part, "[o]bviously the communication between [Mr. Melodick] and me is dysfunctional at best so I'm highly suspect that I'm not getting the full story." [Doc. No. 39-11 at 8].

- After sending the email to ASAC Scott, Ms. Melodick forwarded the email to her supervisor, GS Beasley. GS Beasley responded by stating, "[y]ou

probab[ly] could have sent this to me first so I could have explained my thoughts." *Id.* at 5.

- Ms. Melodick in turn responded, "[y]ou are right. I should have. Sorry about that." *Id.*

- On April 29, 2020, Ms. Melodick met with GS Beasley and ASAC Scott to discuss some of her concerns.

- ASAC Scott began the meeting by reminding Ms. Melodick about the importance of following the chain of command, and Ms. Melodick apologized for sending the email and stated it would not happen again.

- Ms. Melodick next discussed her concerns about the rule that she and Mr. Melodick not exchange personal items inside the building. ASAC Scott defended his decision, explaining that Ms. Melodick and Mr. Melodick could exchange their items in the parking lot or at another location.

- It was around this point in the meeting where both Ms. Melodick and ASAC Scott became frustrated. GS Beasley indicated that ASAC Scott "raised his voice." [Doc. No. 47-12 at 3 at 103:10]. Ms. Melodick interjected by stating that ASAC Scott sounded a lot like her husband. ASAC Scott responded by stating he had bent over backwards for Ms. Melodick. This comment left Ms. Melodick "dumbfounded." [Doc. No. 39-4 at 6].

- Also, at some point during the exchange, ASAC Scott asked Ms. Melodick what she wanted, and he asked if she wanted him to move her to Tulsa. Ms. Melodick, "on the verge of tears and shaking," and having viewed this comment as a "direct threat[]," got up and left the office, stating she would take the matter to the DEA's Office of Professional Responsibility ("OPR"). *Id.*

- The meeting lasted about ten minutes, and after leaving the meeting, Ms. Melodick drove straight home. GS Beasley called Ms. Melodick after the meeting because he "was concerned" and felt that the "meeting resulted in much harder feelings than [he thought] were present than before." [Doc. No. 47-12 at 5 at 115:9–14].

- In his sworn statement to OPR, ASAC Scott admitted he raised his voice during the meeting with Ms. Melodick.

11

▪ Later that day, ASAC Scott sent Ms. Melodick an email, "apologiz[ing] for the way the meeting went," and stating, "I really wish we'd have been able to go further in our discussions into how you are feeling right now." *See* [Doc. No. 39-12 at 4]. He acknowledged that he had "cut [Ms. Melodick] off out of frustration" because he viewed some of her comments to indicate he had given preferential treatment to others or had not supported her in some way. *See id.* at 5. He stated that his "goal is for this office to be successful and for [Ms. Melodick] to be a great addition to the TDS." *See id.* He reminded Ms. Melodick that "EAP[7] has . . . resources available" and offered to meet with Ms. Melodick again if she was "open to it," suggesting she could bring someone else along in addition to GS Beasley to the meeting. *See id.* at 4–5; *see also* [Doc. No. 39-4 at 8; Doc. No. 39-13 at 2].

▪ Ms. Melodick did not respond to ASAC Scott's email. [Doc. No. 39-4 at 9]. He sent a follow-up email on May 1, 2020, stating he "really would like another meeting" if Ms. Melodick was "open to it." [Doc. No. 39-13 at 1]. Ms. Melodick did not respond to the follow-up email either. Rather, she emailed GS Beasley to tell ASAC Scott that she was not interested in speaking. [Doc. No. 39-4 at 10].

▪ SAC Chavez emailed Ms. Melodick on May 1, 2020, advising he had been informed of the meeting Ms. Melodick had with ASAC Scott and GS Beasley earlier in the week. SAC Chavez stated he "would like to speak with [Ms. Melodick] regarding these concerns and see if there is an opportunity to resolve some of these matters." [Doc. No. 39-13 at 4].

▪ Ms. Melodick responded, "[t]hank you Mr. Chavez however, I respectfully decline." *Id.*

▪ On May 4, 2020, SAC Chavez sent Ms. Melodick a second email, stating "[w]hile I understand that this is not necessarily an ideal situation for all involved, it is still my expectation that you be responsive to your chain of command." *Id.* at 3–4. He provided his availability for a call.

▪ Ms. Melodick responded, agreeing to speak to SAC Chavez but asked that a third party be present on the line during the conversation.

---

[7] According to the DEA's website, the DEA Employee Assistance Program ("EAP") is a free, confidential service providing DEA employees and their family members with various services and resources to address personal or work-related problems. *See* United States Drug Enforcement Administration, https://www.dea.gov/resources/eap (last visited Oct. 9, 2025).

- On May 4, 2020, around 1:00 p.m., SAC Chavez, Ms. Melodick, and ASAC Shontal Linder had a phone conversation.

- SAC Chavez and Ms. Melodick had never met prior to the call.

- During the phone call, SAC Chavez asked Ms. Melodick to identify her issues or concerns, but she indicated she did not want to discuss them further. SAC Chavez inquired if Ms. Melodick knew how or needed assistance in filing an EEO or OPR complaint, but she stated she knew how to file both and did not want any help.

- SAC Chavez also asked Ms. Melodick if she had considered the resources offered by DEA's EAP. Ms. Melodick indicated she was aware of EAP and did not want any assistance. SAC Chavez stated that without additional information, there was little he could do. He added that there was an open line of communication with him if Ms. Melodick needed it.

## F. Subsequent Events

- Ms. Melodick contacted the EEO Office on June 1, 2020, and she filed her EEO complaint on August 10, 2020. [Doc. No. 39-4 at 1].

- On September 3, 2020, Ms. Melodick sent a memo to SAC Chavez, ASAC Scott, and GS Beasley with the subject: "Allegations of unprofessional conduct, conduct unbecoming, misuse of official government vehicle, discrimination and creation of a hostile work environment." [Doc. No. 39-15]. SAC Chavez referred Ms. Melodick's memo to OPR the next day.

- OPR initiated an investigation into Ms. Melodick's allegations. On June 2, 2022, the DEA's Board of Professional Conduct issued ASAC Scott a Letter of Clearance for Discrimination and Hostile Work Environment, Creating/Fostering, concluding that the "OPR investigation failed to substantiate allegations [that ASAC Scott] created a hostile work environment at the [OKCDO], or engaged in discriminatory behavior against [Ms. Melodick]." [Doc. No. 39-17]. Ms. Melodick denies that OPR conducted a fair and complete investigation.

- On that same day, the DEA's Board of Professional Conduct issued Mr. Melodick a letter stating that the "OPR investigation did not provide sufficient evidence or sworn witness testimony to make a determination that [Mr. Melodick] engaged in unprofessional conduct, harassing or threatening behavior toward [Ms. Melodick], while assigned to [OKCDO]."

[Doc. No. 39-8 at 1]. Ms. Melodick denies that OPR conducted a fair and complete investigation.

- Neither Mr. Melodick nor ASAC Scott continue to work at OKCDO.

- SAC Chavez is still SAC of DFD and continues to be Ms. Melodick's third-line supervisor. Since the May 4, 2020 phone call with Ms. Melodick, SAC Chavez has been to OKCDO for meetings, training, and office visits, but Ms. Melodick has had minimal interaction with him and no conversations with him since May 2020.

## IV.    <u>ANALYSIS</u>

### A.    Ms. Melodick's Title VII claim is subject to the *McDonnell Douglas* burden-shifting framework.

Title VII makes it unlawful for an employer "to discriminate against any individual . . . because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). "Under Title VII, a plaintiff can prove discrimination in several different ways, including proof of a hostile work environment or disparate treatment." *Throupe v. Univ. of Denver*, 988 F.3d 1243, 1251 (10th Cir. 2021); *see also Sanderson v. Wyo. Highway Patrol*, 976 F.3d 1164, 1174 (10th Cir. 2020) (explaining that a plaintiff can establish a violation under Title VII by proving that discrimination based on sex created a hostile work environment). "A hostile work environment claim is 'composed of a series of separate acts that collectively constitute one unlawful employment practice.'" *Throupe*, 988 F.3d at 1251 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002)).

Ms. Melodick's Title VII hostile work environment claim is subject to the *McDonnell Douglas* burden-shifting framework. *See id.*; *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973). Under the first step of the burden-shifting framework, the plaintiff has the burden of presenting a prima facie case of discrimination.

14

*See Throupe*, 988 F.3d at 1251. If the plaintiff presents a prima facie showing, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the employer's actions. *See id.* If the employer does so, the plaintiff must show that the employer's stated reasons are pretextual. *See id.*

To defeat summary judgment on a hostile work environment claim, a plaintiff must show "(1) that she was discriminated against because of her sex; and (2) that the discrimination was sufficiently severe or pervasive such that it altered the terms or conditions of her employment and created an abusive working environment." *Sanderson*, 976 F.3d at 1174 (citation omitted); *see Throupe*, 988 F.3d at 1251 (same).

## B.    The DEA is entitled to summary judgment on Ms. Melodick's Title VII claim.

The Attorney General contends that Ms. Melodick's evidence fails to establish that she was harassed or discriminated based on her sex or that any alleged harassment was objectively pervasive or severe enough to create an abusive work environment.[8] The Court agrees. Ms. Melodick has failed to create a genuine dispute of material fact that any alleged discrimination was based on her sex or was sufficiently severe or pervasive such that it altered the terms or conditions of her employment and created an abusive working environment. Thus, summary judgment is proper.

---

[8] The Attorney General argues that the only claim by Ms. Melodick properly exhausted is hostile work environment based on sex. *See* Motion at 25–26; *see supra* n.4. Ms. Melodick does not respond substantively to this argument.

1.    *Ms. Melodick has not presented facts from which a jury could infer she suffered sex-based discrimination.*

The first issue is whether Ms. Melodick has presented facts from which a jury could infer she suffered sex-based discrimination. "The plaintiff's sex need only be a 'motivating factor' in the unlawful employment practice." *Throupe*, 988 F.3d at 1251 (quoting 42 U.S.C. § 2000e-2(m)). To make such a showing, a plaintiff may point to acts of harassment that are "facially sex based." *Sanderson*, 976 F.3d at 1174. Additionally, facially sex-neutral conduct can support a finding of sex-based "'animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other, overtly [sex-based] discriminatory conduct.'" *Id.* (quoting *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1097 (10th Cir. 1999)). Under Tenth Circuit precedent, a plaintiff "can use a substantial amount of arguably [sex]-neutral harassment to bolster a smaller amount of [sex]-based conduct on summary judgment." *Chavez v. New Mexico*, 397 F.3d 826, 833 (10th Cir. 2005) (explaining what is important in a hostile work environment claim is the environment itself and sex-neutral harassment plays a significant role in shaping the overall work environment); *see also Penry v. Fed. Home Loan Bank of Topeka*, 155 F.3d 1257, 1262 (10th Cir. 1998) (stating that the existence of harassment is to be considered in light of the record as a whole, which requires a totality-of-the-circumstances analysis).

"If a jury could reasonably infer the conduct was related to the plaintiff's sex, 'then it is for the fact finder to decide whether such an inference should be drawn.'" *Throupe*, 988 F.3d at 1251 (quoting *Sanderson*, 976 F.3d at 1174). Stated another way, if

a plaintiff offers evidence of both sex-based and sex-neutral harassment, and the jury—considering the full context—could reasonably find that all the conduct reflects sex-based hostility, then it is for the fact finder to decide whether to make that inference. *See Chavez*, 397 F.3d at 833. Thus, although it is usually up to the jury to decide if the actions were based on the plaintiff's sex, summary judgment is warranted if the plaintiff has not provided sufficient evidence to create a real dispute about the defendant's motive. *See Throupe*, 988 F.3d at 1251.

There is no evidence of overtly sex-based harassment in the record to substantiate Ms. Melodick's claim of a hostile work environment. Rather, the incidents she identifies are sex neutral. Nor is there any evidence from which a jury could find that men and women were treated differently at OKCDO. Ms. Melodick testified that Mr. Melodick "treated everybody more favorably than [her]"—males and females. *See* [Doc. No. 39-2 at 20 at 116:13–16]. Although Ms. Johnson indicated that Mr. Melodick treated her "differently being a female," [Doc. No. 47-6 at 7 at 32:16–17], there is no evidence that Ms. Melodick was aware of Mr. Melodick's conduct toward Ms. Johnson. *See Doe v. Hutchinson*, 728 F. App'x 829, 833 (10th Cir. 2018) (unpublished) (explaining the plaintiff may rely on evidence the defendant "directed [sex]-based comments to other[s] . . . to help establish a general atmosphere of harassment provided [the plaintiff] was aware of such conduct") (citation omitted)); *Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1146 (10th Cir. 2008) (stating that evidence of a general work atmosphere, including evidence that others were harassed, may be considered as long as the plaintiff "presents evidence that he knew about the offending behavior"); *see also Bird v. W.*

*Valley City*, 832 F.3d 1188, 1207 (10th Cir. 2016) (absent evidence the plaintiff was aware of the defendant's actions toward others before litigation, she cannot rely on them to demonstrate her subjective perception of an abusive environment based on sex). Not only has Ms. Melodick failed to produce evidence indicating she was herself aware of Mr. Melodick's offending behavior toward Ms. Johnson, but she also attests to the contrary, stating Mr. Melodick treated everyone, males and females, better than her.

Viewing the evidence in a light most favorable to Ms. Melodick, a jury could not reasonably conclude that the conduct she complains of was motivated by sex. Nor does the sex-neutral conduct raise an inference that Ms. Melodick was treated a certain way because she is a woman. The fact that Mr. Melodick released employees due to inclement weather without informing Ms. Melodick bears no relation to Ms. Melodick being a female. The fact that Mr. Melodick stood in Ms. Melodick's path at a training event, causing her to have to push past him, is independent of her being female. Nor is there evidence that Mr. Melodick was motivated by Ms. Melodick's sex when he walked behind her desk, stared at her, forwarded her incomplete report to ASAC Scott, or drove his official government vehicle to their former marital residence to pick up personal items. At best, this evidence demonstrates that Mr. Melodick and Ms. Melodick had a tumultuous relationship and Mr. Melodick's conduct was motivated by personal animus or hostility toward Ms. Melodick. "[I]solated incidents" and "personality conflicts 'cannot supply a basis' for a reasonable jury to infer discrimination." *Overfield v. Kansas*, No. 23-3057, 2024 WL 1611473, at *6 (10th Cir. Apr. 15, 2024) (unpublished) (first citing *Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998); then quoting *Parker v. Hous.*

*Auth. of Kan. City*, No. 92-3136, 1993 WL 207441, at *4 (10th Cir. June 9, 1993) (unpublished)).

ASAC Scott's actions also have no connection to Ms. Melodick being a female. Neither Mr. Melodick nor Ms. Melodick were permitted to exchange personal items inside the office building. ASAC Scott did not mandate that the exchanges occur in the parking lot but only stated that the items could not be exchanged inside the building. The policy applied equally to Mr. Melodick (a male) and Ms. Melodick (a female). Additionally, Mr. Melodick and Ms. Melodick agreed it would be beneficial to exchange the children on the same day the duty schedule started. On September 19, 2019, they signed an Agreed Temporary Order that established "a week on/week off schedule" with Monday being the exchange day for the children. On October 1, 2019, ASAC Scott changed OKCDO's weekly duty schedule to a Monday-to-Monday schedule, which arguably benefitted both Melodicks given their agreed custody schedule. Additionally, Ms. Melodick's move to the TDS group was not sex driven. She indicated she agreed to the move because ASAC Scott wanted an experienced special agent in the TDS group, and this would create some space between her and Mr. Melodick because they would be on separate floors. The move was neither a demotion nor a promotion.

Turning to the April 29, 2020, meeting with ASAC Scott and GS Beasley, Ms. Melodick addressed her concern that she and Mr. Melodick were not permitted to exchange personal items inside the office. ASAC Scott defended his decision, explaining that they were free to exchange their items in the parking lot or at another location. It was around this point in the meeting where both Ms. Melodick and ASAC Scott became

frustrated. ASAC Scott raised his voice, and Ms. Melodick interjected by stating that ASAC Scott sounded a lot like her husband. ASAC Scott responded by stating he had bent over backwards for Ms. Melodick, and he asked her if she wanted him to move her to Tulsa. The meeting lasted about ten minutes and culminated in Ms. Melodick walking out and stating she would take the matter to the DEA's OPR. ASAC Scott became frustrated, and he let his emotions get the best of him, but at no time did he make any remarks that would indicate his actions were because of Ms. Melodick's sex. Rather, as he contends, it appears that he was frustrated that Ms. Melodick would accuse him of giving preferential treatment to others or not supporting her in some way.[9] *See* [Doc. No. 39-12 at 5 at 21:4–8]. Thus, this facially sex-neutral incident has a reasonable explanation that has nothing to do with Ms. Melodick's sex, and the Court finds that a reasonable jury would not find that ASAC Scott's actions on April 29, 2020, were because of Ms. Melodick's sex.

SAC Chavez became Ms. Melodick's third-line supervisor in January 2020. He reached out to Ms. Melodick by email on May 1, 2020, advising he had been informed of Ms. Melodick's April 29th meeting with ASAC Scott and GS Beasley. He indicated in his email that he would like to speak with Ms. Melodick regarding her concerns to see if he could help resolve some of the issues. Initially, Ms. Melodick declined his offer. SAC

---

[9] To the extent Ms. Melodick claims that ASAC Scott treated Mr. Melodick differently, Ms. Melodick has not provided any evidence that she and Mr. Melodick are similarly situated employees. *See, e.g.*, *Overfield*, 2024 WL 1611473, at *5 (explaining that a plaintiff establishing discriminatory animus with evidence of differential treatment bears the burden of showing that the employees are similarly situated) (citing *Hysten v. Burlington N. & Santa Fe Ry. Co.*, 296 F.3d 1177, 1182 (10th Cir. 2002)).

Chavez followed up, and Ms. Melodick agreed to speak to him if a third party could be present. On May 4, 2020, SAC Chavez, Ms. Melodick, and ASAC Shontal Linder spoke by phone. Prior to that call, SAC Chavez and Ms. Melodick had never met. During the phone call, Ms. Melodick indicated she did not want to discuss her issues or concerns. SAC Chavez inquired if Ms. Melodick knew how or needed assistance in filing an EEO or OPR complaint, to which Ms. Melodick acknowledged she knew how to file both and she did not want any help. Additionally, SAC Chavez asked Ms. Melodick if she had considered the resources offered by DEA's EAP, to which Ms. Melodick indicated she was aware of EAP and declined any assistance. SAC Chavez ended the call by stating there was an open line of communication with him if Ms. Melodick needed it. Ms. Melodick has had minimal interaction with SAC Chavez and no conversations with him since May 2020. This sex-neutral conduct does not raise an inference that SAC Chavez treated Ms. Melodick a certain way because she is a woman.

In summary, Ms. Melodick has not adduced evidence from which a reasonable jury could infer discrimination based on sex by any of the three management officials, Mr. Melodick, ASAC Scott, or SAC Chavez, between March 2019 and May 2020.

### 2. Ms. Melodick has not shown that any alleged harassment was objectively severe or pervasive.

The second issue is whether Ms. Melodick has shown that a reasonable jury could find that any alleged harassment was sufficiently severe or pervasive such that it altered the terms or conditions of her employment and created an abusive working environment. "Proof of either severity *or* pervasiveness can serve as an independent ground to sustain a

hostile work environment claim." *Throupe*, 988 F.3d at 1252 (emphasis added). "An employer creates a hostile work environment when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the [employee's] employment and create an abusive working environment." *Iweha v. Kansas*, 121 F.4th 1208, 1221 (10th Cir. 2024) (internal quotation marks and citation omitted).

A plaintiff must show the work environment was both objectively and subjectively hostile. *See Throupe*, 988 F.3d at 1252. "It is not enough that the plaintiff perceived the conduct to be severe or pervasive." *Id.* Here, the Attorney General does not challenge whether Ms. Melodick subjectively found her work environment hostile. Therefore, the focus is on whether Ms. Melodick has established the objective component of her hostile work environment claim.

In making this determination, the Court examines the objective severity "from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Morris v. City of Colo. Springs*, 666 F.3d 654, 664 (10th Cir. 2012) (citation and emphasis omitted). That is, the Court, under a totality-of-the-circumstances review, considers "'such factors as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Throupe*, 988 F.3d at 1252 (quoting *Morris*, 666 F.3d at 664).

The Attorney General asserts that the conduct at issue was neither objectively severe nor pervasive. The Court agrees that Ms. Melodick "cannot satisfy the high bar

required for a hostile work environment claim—on either the issue of severity or pervasiveness." *Iweha*, 121 F.4th at 1223. The Court is certainly empathetic to Ms. Melodick's situation; the emotional strain of a divorce is significant on its own, without the added challenge of having to work alongside a former spouse. But none of the conduct Ms. Melodick identifies rises to the level of severity or pervasiveness required for a hostile work environment claim.

The incidents described by Ms. Melodick occurred in the fourteen months following her marital separation from Mr. Melodick. Ms. Melodick has been employed by the DEA for more than twenty years. The facts supported by evidence, accepted as true, and viewed in the light most favorable to Ms. Melodick, show that over the span of these fourteen months, Ms. Melodick and Mr. Melodick were undergoing a contentious marital separation and were struggling to communicate and work alongside each other in the same office. Ms. Melodick's second-line supervisor ASAC Scott struggled to effectively manage the escalating interpersonal conflict between Ms. Melodick and Mr. Melodick. ASAC Scott allowed his frustration to influence his response in the April 29, 2020, meeting by asking if Ms. Melodick wanted him to move her to Tulsa. He then followed up in an email apologizing for the way the meeting went and acknowledging he had been frustrated.

Ms. Melodick argues that ASAC Scott's statement about Tulsa, made in the heat of the moment, can be construed as a threat, and that ASAC Scott knew "any such transfer would negatively impact her professionally and personally" and "would lead to her losing custody of the children." [Doc. No. 47 at 29]. Although ASAC Scott's

statement was troubling given its timing with Ms. Melodick's divorce, there is no evidence of record he was ever going to transfer Ms. Melodick to Tulsa, or that there was an opening in the Tulsa office. Further, Ms. Melodick was never transferred to Tulsa, and she still works at OKCDO. Objectively, a reasonable person would not interpret that statement as a threat.

Additionally, although some of Mr. Melodick's behavior may have been annoying or uncomfortable for Ms. Melodick, and perhaps juvenile, none of the conduct was "physically threatening or humiliating," *Faragher v. Boca Raton*, 524 U.S. 775, 787–88 (1998), nor does it satisfy "the extremely high bar that a plaintiff typically must surpass in order to successfully make a claim that their work environment was . . . overtly hostile in an unlawful way," *Iweha*, 121 F.4th at 1224–25. The Tenth Circuit has "found conduct sufficiently severe to overcome summary judgment in only particularly threatening or humiliating circumstances." *Throupe*, 988 F.3d at 1255. In *Morris*, the Tenth Circuit upheld a district court's grant of summary judgment for the employer where the doctor hit the employee-nurse on the head twice within a two-week period, threw human tissue at her in the operating room and joked about it afterward, and yelled at her and made demeaning comments. 666 F.3d at 665–66. In *Sprague v. Thorn Americas, Inc.*, the Tenth Circuit concluded that "five separate incidents of allegedly sexually-oriented, offensive comments either directed to [the plaintiff] or made in her presence in a sixteen[-]month period" were not sufficiently severe or pervasive to support a hostile work environment claim. 129 F.3d 1355, 1365–66 (10th Cir. 1997).

Finally, Ms. Melodick has not presented any evidence to show that the alleged harassment interfered with her work performance. Ms. Melodick still works at OKCDO. The evidence of record shows that she continued to successfully complete her duty agent responsibilities after the schedule change. Although she moved to a different floor and to the TDS group, she agreed to the move because ASAC Scott wanted an experienced special agent in that group and because it would create space between her and Mr. Melodick. There was no change in pay or title.

Evaluating the totality of the circumstances and viewing the record in the light most favorable to Ms. Melodick, the Court concludes that Ms. Melodick cannot establish that the conduct at issue was sufficiently severe or pervasive to support a hostile work environment claim.

## V.    <u>CONCLUSION</u>

Based on the parties' submissions and the applicable law, the DEA is entitled to summary judgment on Ms. Melodick's Title VII claim. Consequently, the Court GRANTS the Attorney General of the United States' Motion for Summary Judgment [Doc. No. 39]. A separate judgment will follow.

IT IS SO ORDERED this 13th day of October 2025.

JODI W. DISHMAN
UNITED STATES DISTRICT JUDGE